UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHANIE BERMUDEZ,

               Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6427P


## PRELIMINARY STATEMENT

      Plaintiff Stephanie Bermudez ("Bermudez") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 16).

      Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 12, 13).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.      Procedural Background

Bermudez applied for SSI on August 24, 2010, alleging disability beginning on June 1, 1996, due to depression and anxiety.  (Tr. 110, 114).[1]  On November 22, 2010, the Social Security Administration denied Bermudez's claim for benefits, finding that she was not disabled.  (Tr. 47-48).  Bermudez requested and was granted a hearing before Administrative Law David S. Pang (the "ALJ").  (Tr. 69-71, 81-85).  The ALJ conducted a hearing on December 2, 2011.  (Tr. 22-46).  Bermudez was represented at the hearing by her attorney Ida M. Comerford, Esq.  (Tr. 22, 102).  In a decision dated January 13, 2012, the ALJ found that Bermudez was not disabled and was not entitled to benefits.  (Tr. 49-60).

On June 18, 2013, the Appeals Council denied Bermudez's request for review of the ALJ's decision.  (Tr. 1-6).  Bermudez commenced this action on August 13, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.     Relevant Medical Evidence[2]

#### A.      Treatment Records

##### 1.      Clinton Family Health Center

Treatment notes indicate that Bermudez began treating with Fatma Akmese ("Akmese"), MD, at the Clinton Family Health Center in July 2009.  (Tr. 211-12).  According to the notes, on July 20, 2009, Bermudez attended an appointment with Akmese in order to establish care.  (*Id.*).  Bermudez reported that she was seeking a referral for mental health treatment.  (*Id.*).  According to Bermudez, she was previously treated by Dr. Seeger at Genesee

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

Mental Health Center ("GMHC"), but she had failed to follow through with treatment. (*Id.*). Bermudez had been prescribed Celexa and Trazodone, but did not take the medication due to its side effects. (*Id.*).

Bermudez reported that she was depressed and frustrated by her living situation. (*Id.*). According to Bermudez, she had moved to the United States from Puerto Rico when she was eighteen years old, and her father and brother were living with her illegally. (*Id.*). Bermudez complained that her father was supposed to assist with the bills, but was not complying with his obligations, resulting in verbal altercations between them. (*Id.*). According to Bermudez, she once had "pulled a knife" on her father, but ultimately put the knife away. (*Id.*). Bermudez reported a history of psychotherapy since she was nine years old, but that she had never attempted suicide and denied suicidal ideation. (*Id.*). Bermudez also reported a prior visit to the emergency department for an anxiety attack. (*Id.*). Akmese prescribed Wellbutrin to address Bermudez's depression and referred her to GMHC for mental health treatment. (*Id.*).

Bermudez returned for an appointment with Akmese on September 22, 2009. (Tr. 218). According to the treatment notes, Bermudez reported that she did not take the Wellbutrin that Akmese had prescribed, but was interested in restarting it to address her anxiety, as well as to assist her efforts at smoking cessation. (*Id.*). Akmese gave her a prescription for Wellbutrin. (*Id.*).

On March 1, 2010, Bermudez returned for an appointment with Akmese, indicating that Wellbutrin had increased her desire to smoke and that she continued to be depressed. (*Id.*). Akmese noted that Bermudez appeared "happy," but noted that Bermudez reported that she frequently "gets moody" and argues with her partner. (*Id.*). Bermudez reportedly planned to marry the following year and was hoping to get pregnant. (*Id.*). Akmese

3

advised Bermudez against attempts to conceive because a child would likely add stress.  (*Id.*).

Akmese prescribed Lexapro to address Bermudez's reported depression.  (*Id.*).

 Treatment notes indicate that Bermudez returned for an appointment on June 2,

2010.  (Tr. 222).  During the appointment, Bermudez complained of insomnia and fatigue.  (*Id.*).

Akmese refilled Bermudez's prescriptions for antidepressants.  (*Id.*).

 On June 27, 2011, Bermudez saw Akmese and complained of ear pain and low

back pain.  (Tr. 223).  According to Bermudez, the pain was located in her lumbar spine and did

not radiate.  (*Id.*).  Bermudez told Akmese that she had been taking her neighbor's Percocet for

two weeks and that it alleviated her symptoms.  (*Id.*).  Bermudez requested a prescription for

Percocet.  (*Id.*).

 Upon examination, Akmese noted no tenderness in the paraspinal and spinal

processes of the lumbar spine, normal range of motion of the spine without pain, negative

straight leg raise and normal strength, sensation and reflexes bilaterally in Bermudez's lower

extremities.  (*Id.*).  Akmese prescribed Flexeril to address Bermudez's back pain and advised her

to cease taking her neighbor's Percocet.  (*Id.*).

 On July 6, 2011, Bermudez and Akmese discussed completing a Department of

Social Services' evaluation for employment.  (Tr. 226).  Bermudez informed Akmese that she

could not work due to her depression and low back pain.  (*Id.*).  Akmese advised her that any

psychological assessment of her work capacity should be provided by her mental health provider,

and he opined that he believed that she could work, particularly if she were provided limitations.

(*Id.*).

 Upon examination, Akmese noted no tenderness in the paraspinal and spinal

processes of Bermudez's lower spine, normal range of motion of the spine without pain, negative

straight leg raises, and normal strength, sensations and reflexes bilaterally in Bermudez's lower extremities.  (*Id.*).

### 2.    **GMHC**

The record contains treatment notes from GMHC beginning in May 2009. (Tr. 235-37).  On May 4, 2009, Bermudez attended a pre-admission screening appointment with a licensed social worker, Amy Walkowicz ("Walkowicz").  (*Id.*).  During the meeting, Bermudez reported experiencing depressive symptoms, including low mood, low energy, and body aches in her head, back and chest.  (*Id.*).  Bermudez reported crying spells, feeling easily frustrated and irritable, and racing thoughts.  (*Id.*).  She also reported poor sleep, poor appetite, and difficulty focusing and concentrating.  (*Id.*).  Bermudez reported auditory hallucinations, primarily in the evenings.  (*Id.*).

Bermudez reported a troubled childhood in Puerto Rico with her alcoholic mother.  (*Id.*).  She reported attending therapy in Puerto Rico at the age of eight and a history of behavioral problems in school.  (*Id.*).  She also reported an emergency department visit in November 2008 due to a possible anxiety attack.  (*Id.*).  According to Bermudez, she attempted suicide at the age of ten and continues to experience suicidal ideation when she is very upset.  (*Id.*).  Bermudez reported ongoing pain in her left hip that worsens with depression.  (*Id.*).

Walkowicz noted that Bermudez appeared well-groomed, was cooperative, and used spontaneous and clear speech.  (*Id.*).  According to Walkowicz, Bermudez reported racing thoughts and negative ruminations, and presented a depressed mood and a flat affect.  (*Id.*).  Walkowicz noted a high level of family conflict and that Bermudez was unemployed.  (*Id.*).  Walkowicz diagnosed Bermudez with depressive disorder, not otherwise specified, rule out major depressive disorder and panic disorder without agoraphobia, and assessed a Global

Assessment of Functioning ("GAF") of 52.  (*Id.*).  Walkowicz scheduled Bermudez for an appointment for further evaluation.  (*Id.*).

On May 8, 2009, Bermudez met with Jessica Tackaberry ("Tackaberry"), a licensed therapist.  (Tr. 238-29).  During the appointment, Bermudez reported vague thoughts of feeling overwhelmed and stressed.  (*Id.*).  Tackaberry noted that Bermudez presented with a depressed and anxious mood and that her thought content was characterized by negative ruminations and paranoia.  (*Id.*).  Tackaberry scheduled Bermudez for an assessment and psychiatric evaluation.  (*Id.*).

On May 29, 2009, Bermudez missed her scheduled appointment with Tackaberry due to reported transportation problems.  (Tr. 240-45).  When Tackaberry attempted to reschedule the appointment for another day, Bermudez became upset and indicated that she was having thoughts of suicide.  (*Id.*).  Tackaberry scheduled an appointment for later that day, during which Bermudez reported thoughts of suicide and a history of non-suicidal, self-injurious cutting.  (*Id.*).  Tackaberry discussed a potential referral for partial hospitalization, but transportation presented a barrier to treatment.  (*Id.*).  Dr. Seeger prescribed Celexa and Trazadone to be dispensed by Bermudez's father.  (*Id.*).

During the appointment, Bermudez reported a history of physical and sexual abuse as a child and that she had not been in a relationship for three years.  (*Id.*).  Bermudez reported that she had completed the seventh grade, had difficulty concentrating at school and had no work history.  (*Id.*).  Bermudez was admitted for outpatient treatment at GMHC for depression and anxiety.  (*Id.*).

Between June 2009 and January 2010, Bermudez continued to attend appointments with Tackaberry.  (Tr. 246-64).  Treatment notes indicate that Bermudez was not

taking her medication as prescribed and repeatedly missed appointments.  (*Id.*).  Initially, Bermudez reported that she discontinued her medication because of side effects.  (*Id.*).  She later reported that she stopped taking her medication because she might be pregnant.  (*Id.*).  Once Bermudez determined that she was not pregnant, she recommenced her medication.  (*Id.*).

Tackaberry arranged for transportation to treatment due to Bermudez's inconsistent attendance.  (*Id.*).  According to the treatment notes, Bermudez had difficulty utilizing public transportation on her own and experienced extreme anxiety or disorientation when lost.  (*Id.*).  During this time period, Bermudez reported no suicidal ideation, but reported experiencing depressive symptoms, including crying spells, isolation and anger towards her father.  (*Id.*).  Based upon Bermudez's symptoms, Tackaberry referred her to an Intensive Psychiatric Rehabilitation Program ("IPRT") to assist her to be able to participate in the work force.  (*Id.*).  Bermudez declined participation in the IPRT.  (*Id.*).  Bermudez expressed her belief that a GED would be more beneficial, but then changed her mind and requested a referral for vocational training, stating that she wanted to obtain employment.  (*Id.*).

On February 15, 2010, Tackaberry discharged Bermudez from treatment. (Tr. 265-66).  According to the discharge summary, Bermudez's participation in treatment was inconsistent and she had been warned that failure to attend appointments would result in discharge.  (*Id.*).  Tackaberry noted that Bermudez had made little progress in addressing her depression and anxiety because of her failure to attend scheduled appointments.  (*Id.*).  Upon discharge, Tackaberry diagnosed Bermudez with depressive disorder, not otherwise specified, rule out personality disorder, not otherwise specified, and assessed a GAF of 55.  (*Id.*).

Approximately three months later, on May 24, 2010, Bermudez attended a screening appointment at GMHC to be evaluated for readmission for mental health treatment.

7

(Tr. 269-70).  Bermudez reported that she had stopped attending appointments because she was dissatisfied with treatment.  (*Id.*).  Bermudez reported continued depressive symptoms, including low mood and energy, inability to sleep, irritability and stress.  (*Id.*).  Bermudez reported sporadic episodes of poor appetite and auditory hallucinations.  (*Id.*).  Bermudez reported a history of panic attacks characterized by difficulty breathing, chest pain and feelings of nervousness and being overwhelmed.  (*Id.*).  Bermudez also reported some back pain.  (*Id.*). According to Bermudez, she was no longer taking Lexapro because she did not believe it was effective and it caused her to feel nervous, weak and sleepy.  (*Id.*).  Bermudez denied previous work history, but stated that she was interested in obtaining employment because she did not receive enough assistance from the Department of Social Services to satisfy her financial needs. (*Id.*).

During the examination, Bermudez's speech was clear and spontaneous, her thoughts were goal-directed and organized, and her mood was stable.  (*Id.*).  Bermudez was diagnosed with depressive disorder, not otherwise specified and rule out personality disorder based upon previous treatment records.  (*Id.*).  She was assessed a GAF of 58 and was assigned a licensed therapist, Laura Masceri ("Masceri"), for ongoing treatment.  (*Id.*).

Bermudez met with Masceri three times in June 2010.  (Tr. 271-77, 280-81). During those appointments, Bermudez reported that she continued to experience depression, low energy and mood, difficulty sleeping, increased anxiety and physical pain.  (*Id.*).  According to Bermudez, her mental symptoms were interfering with her appetite and sleep.  (*Id.*).  Bermudez told Masceri that she wanted to earn her GED and obtain employment, but believed that her symptoms would inhibit her ability to obtain those goals.  (*Id.*).  Bermudez reported that she had difficulty living with her father.  (*Id.*).  Bermudez reported that she believed therapy helped to

8

improve her symptoms and that she was interested in pursuing treatment.  (*Id.*).  Masceri

admitted Bermudez to treatment, diagnosing her with depressive disorder, not otherwise

specified, rule out major depression, rule out panic disorder without agoraphobia, and based

upon historical treatment records, rule out personality disorder, not otherwise specified.  (*Id.*).

Masceri assessed a GAF of 60 and recommended a medical evaluation.  (*Id.*).

On June 24, 2010, Bermudez attended a medical evaluation with Lewis

Mehi-Madrona ("Mehi-Madrona"), MD.  (Tr. 278-79).  Bermudez complained of difficulty

sleeping, but noted that Benadryl helped.  (*Id.*).  Mehi-Madrona noted that Bermudez

demonstrated goal-directed thoughts and an appropriate affect within normal limits.  (*Id.*).  He

recommended that she continue to take Benadryl.  (*Id.*).

Bermudez attended one appointment with Masceri in July 2010.  (Tr. 282-83).

During the appointment, Bermudez complained of depression, flashbacks, and difficulty sleeping

and regulating her emotions.  (*Id.*).  Bermudez reported that she continued to have difficulty

living with her father, who had become increasingly volatile and with whom she had had a

physical altercation.  (*Id.*).  During the session, Bermudez demonstrated logical and goal-directed

thoughts and a depressed mood.  (*Id.*).

During July 2010, Bermudez also attended an appointment with Mehi-Madrona.

(Tr. 284-85).  Bermudez reported that the Benadryl was not assisting her sleep and that her father

had hit her.  (*Id.*).  Bermudez also reported a fear of riding on buses because she had almost been

raped on a bus in Puerto Rico.  (*Id.*).  Mehi-Madrona noted that Bermudez demonstrated

goal-directed thoughts and an appropriate affect within normal limits.  (*Id.*).  He prescribed

Zolpidem.  (*Id.*).

Bermudez attended three therapy sessions with Masceri in August 2010. (Tr. 286-88). At the beginning of August, Bermudez reported feeling "much better" and that she had been taking her medication and utilizing coping skills learned during her sessions. (*Id.*). Masceri noted that Bermudez's mood was euthymic. (*Id.*). During subsequent appointments, Bermudez reported that she had run out of her medication and complained of depression, anxiety, paranoia, and insomnia, and reported that she isolated herself. (*Id.*). According to Bermudez, she feels scared and becomes panic stricken around other people and suffers extreme anxiety at night. (*Id.*). On August 31, 2010, Bermudez reported that she had been able to go out in public three times since her previous appointment on August 17, 2010. (*Id.*). Masceri noted that Bermudez demonstrated an anxious and depressed mood. (*Id.*).

During September and October 2010, Bermudez attended four therapy sessions with Masceri. (Tr. 289-92). During those appointments, Bermudez presented depressed and anxious moods and continued to complain of depression, anxiety, stress and difficulty sleeping. (*Id.*). Bermudez reported that she had made an appointment for a sleep study and continued to experience conflict with her family. (*Id.*). Bermudez also reported difficulty managing stress and becoming easily overwhelmed. (*Id.*).

On October 27, 2010, Bermudez attended an appointment with Mehi-Madrona for evaluation of her medication. (Tr. 293-94). Bermudez reported feeling fatigued and experiencing "pain all over," including in her back. (*Id.*). Bermudez reported that she was experiencing financial stress and that she wanted to apply for SSI. (*Id.*). Bermudez also reported that she saw shadows in the house every day and felt increased stress due to her inability to stop her dog from barking and harassment from her neighbors. (*Id.*). Bermudez indicated that she had a good relationship with her boyfriend, who was in the police academy. (*Id.*).

Mehi-Madrona prescribed Aripiprazole (also known as Abilify) and recommended that Bermudez attend group therapy.  (*Id.*).

On November 29, 2010, Bermudez attended another appointment with Mehi-Madrona.  (Tr. 295-96).  During the appointment, Bermudez complained of back pain and feeling weak and tired.  (*Id.*).  According to Bermudez, she continued to have difficulty sleeping.  (*Id.*).  Bermudez reported that she continued to argue with her family, who had poor impulse control, but she noted that she had a supportive boyfriend.  (*Id.*).  Bermudez also expressed frustration because her application for SSI had been denied.  (*Id.*).  Mehi-Madrona noted that Bermudez demonstrated goal-directed thoughts and an appropriate affect.  (*Id.*).  He restarted Celexa and Trazadone at her request and suggested that she bring her family to her next appointment.  (*Id.*).  He encouraged Bermudez to attend group therapy, but she indicated that she felt too weak to attend.  (*Id.*).

In December 2010, Bermudez attended two therapy sessions with Masceri.  (Tr. 297-98).  During those appointments, Bermudez reported continuing feelings of depression, tearfulness, anxiety and negative ruminations.  (*Id.*).  Bermudez reported ongoing stressful events involving her family, and Masceri noted that Bermudez failed to implement the skills she had learned during therapy sessions.  (*Id.*).  According to Masceri, Bermudez demonstrated a flat affect and depressed and anxious mood.  (*Id.*).

Bermudez attended two therapy sessions with Masceri during January 2011.  (Tr. 299, 302).  During those appointments, Bermudez reported that she continued to experience depression, tearfulness and frustration.  (*Id.*).  According to Bermudez, she had stopped taking her medications and had experienced an increase in symptoms and coping difficulties.  (*Id.*).  According to Masceri, Bermudez demonstrated negative ruminations and a depressed and

anxious mood. (*Id.*). On January 25, 2011, Bermudez reported that although Abilify was effective, she thought that it might be interrupting her sleep. (Tr. 303-04). Mehi-Madrona noted that Bermudez's mood was stable and recommended that she take Abilify in the morning and that she bring her family to the next appointment. (*Id.*).

During February and March 2011, Bermudez attended three therapy sessions with Masceri. (Tr. 309-11). Bermudez reported that she continued to experience negative ruminations, tearfulness, depression, anxiety and paranoia. (*Id.*). According to Bermudez, she was also experiencing auditory hallucinations. (*Id.*). Bermudez reported that living with her father had become increasingly "chaotic" and that she continually felt rejected and invalidated by him. (*Id.*). According to Masceri, Bermudez's living situation caused her to become emotionally "disregulated." (*Id.*). Masceri noted that Bermudez presented with a depressed and anxious mood. (*Id.*).

During April and May 2011, Bermudez attended three therapy sessions with Masceri. (Tr. 312-14). Bermudez reported that she continued to experience tearfulness, frustration, depression and difficulty sleeping. (*Id.*). She reported that she had not retrieved her medications from the pharmacy. (*Id.*). Masceri explored barriers to Bermudez's ability to obtain her medication and linked Bermudez's failure to take her medication to her low stress tolerance. (*Id.*). Bermudez also reported that she had been taking her friend's Valium and had reported alcohol use. (*Id.*). Masceri identified risks for Bermudez and discussed alternatives. (*Id.*). Masceri suggested referring Bermudez to the PROS program. (*Id.*).

On June 9, 2011, Bermudez met with Nurse Monika Quistorf ("Quistorf") for a medication evaluation. (Tr. 319). Bermudez requested a prescription for Valium, and Quistorf noted that she had been non-compliant with her medications. (*Id.*). Quistorf advised Bermudez

against using her friend's Valium and determined to continue monitoring Bermudez's progress

with her prescribed medication regimen.  (*Id.*).

During June and July 2011, Bermudez attended three appointments with Masceri.

(Tr. 320-22).  During those appointments, Bermudez presented with depressed mood, anxiety

and agitation.  (*Id.*).  Bermudez reported ongoing conflict with her father.  (*Id.*).  According to

Bermudez, on one occasion, she had become so emotionally distraught that a crisis intervention

service was contacted.  (*Id.*).

On August 2, 2011, Masceri completed an annual psychosocial update for

Bermudez.  (Tr. 318).  Masceri noted that Bermudez continued to be diagnosed with depressive

disorder and personality disorder and assessed a GAF of 60.  (*Id.*).  Masceri noted that

Bermudez's psychiatric stability fluctuated due to crises in her home and that she continued to

struggle living with her father.  (*Id.*).  According to Masceri, Bermudez lived in a chaotic

environment that made it difficult for her to utilize the skills that she had learned in therapy.

(*Id.*).

During September 2011, Bermudez attended two more sessions with Masceri.

(Tr. 323-24).  Bermudez again reported that she had run out of her medication.  (*Id.*).  Bermudez

reported depression, decreased appetite and sleep, and that she was hearing voices.  (*Id.*).

Masceri noted that Bermudez presented with a depressed and anxious mood.  (*Id.*).

**B.      Medical Opinion Evidence**

**1.      Akmese**

On July 6, 2011, Akmese completed a Physical Assessment for Determination of

Employability for the Monroe County Department of Human Services.  (Tr. 227-30).  Akmese

indicated that she had been treating Bermudez for the past two years and that she had evaluated

her twice during the preceding twelve months.  (*Id.*).  Akmese opined that Bermudez was able to use public transportation.  (*Id.*).  She assessed that Bermudez could work up to thirty hours a week with reasonable accommodations.  (*Id.*).  Akmese indicated that the limitations she assessed were expected to be necessary for six months.  (*Id.*).  According to Akmese, Bermudez should be precluded from repetitive lifting, bending and twisting due to her chronic back pain. (*Id.*).

Upon examination, Akmese noted that Bermudez's appearance was normal and that she was able to perform heel and toe walking and could squat.  (*Id.*).  According to Akmese, Bermudez had no limitations in her ability to walk, stand or sit, but could only push, pull and bend for two to four hours and lift or carry for one to two hours during an eight-hour workday. (*Id.*).

## 2.    **Masceri**

On May 9, 2011, Masceri completed a mental Residual Functional Capacity ("RFC") assessment.  (Tr. 316-17).  Masceri opined that Bermudez suffered from moderate[3] limitations in her ability to understand and remember short and simple and detailed instructions or tasks, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, interact appropriately with the general public or customers, ask simple questions or request assistance from supervisors, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to expected changes in the work setting or routine and travel in unfamiliar settings or use public transportation.  (*Id.*).

---

[3]  Moderate was defined to indicate the "activity is somewhat impaired (can be performed at 80-85% of expected or normal levels in terms of speed and accuracy of carrying out the task) but can be engaged in occasionally to frequently (1/3 - 2/3 of a day) but not constantly or continuously."  (*Id.*).

Masceri opined that Bermudez would have slight or no[4] limitations in her ability to remember locations and work-like procedures, carry out short and simple (one or two-step) repetitive instructions or tasks, carry out detailed (three or more steps) instructions, maintain attention and concentration for at least two straight hours with at least four such sessions in a workday, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without unreasonable number and length of rests, set realistic goals or make plans independently, and assess normal hazards and take necessary precautions. (*Id.*). According to Masceri, a routine, repetitive, simple, entry-level job would not increase Bermudez's psychologically-based symptoms. (*Id.*).

On November 19, 2011, Masceri completed another mental RFC assessment. (Tr. 325-29). Masceri reported that she had treated Bermudez on a biweekly basis for over a year. (*Id.*). Masceri also noted that Bermudez had difficulty sleeping. (*Id.*). According to Masceri, Bermudez had been diagnosed with anxiety disorder and depressive disorder and had a current GAF of 50. (*Id.*). Bermudez noted that Bermudez's highest GAF for the past year was 50.[5] Masceri indicated that Bermudez had shown some progress with treatment, although "due to social environment[,] [Bermudez's] progress is slow." (*Id.*). According to Masceri, Bermudez's prognosis was poor.[6] (*Id.*).

---

[4] The phrase slight or no limitations was defined to indicate that "[p]erformance of the task is only minimally impaired; e.g., 90% or more of normal and the activity can be engaged in constantly or continuously throughout an eight hour day." (*Id.*).

[5] This is inconsistent with Masceri's treatment notes that reflect repeated GAFs over 50. (*See*, *e.g.*, Tr. 275, 318).

[6] This is inconsistent with Masceri's treatment notes indicating that Bermudez's prognosis was fair. (Tr. 318).

Masceri opined that Bermudez was seriously limited[7] in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, deal with normal work stress, understand, remember and carry out detailed instructions, deal with stress of semi-skilled and skilled work, maintain socially appropriate behavior, travel in an unfamiliar place, and use public transportation.  (*Id.*).  Masceri further opined that Bermudez was limited, but satisfactory in her ability to remember work-like procedures, understand, remember and carry out very short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, assess normal hazards and take appropriate precautions and interact appropriately with the general public.  (*Id.*).  Masceri also opined that Bermudez was unlimited in her ability to sustain an ordinary routine without special supervision, ask simple questions or request assistance, and adhere to basic standard of neatness and cleanliness.  (*Id.*).

Masceri opined that Bermudez would be absent from work approximately four days per month due to her impairments and would not be able to engage in full-time competitive employment on a sustained basis.  (*Id.*).

---

[7]  "Seriously limited" was defined to mean that the "ability to function in this area is seriously limited and would frequently be less than satisfactory in any work setting."  (*Id.*).

3.    **A. Hochberg, Psychology**

On November 22, 2010, agency medical consultant Dr. A. Hochberg

("Hochberg") completed a Psychiatric Review Technique.  (Tr. 146-59).  Hochberg concluded

that Bermudez's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According

to Hochberg, Bermudez suffered from moderate limitations in her ability to maintain

concentration, persistence or pace, and mild limitations in her ability to perform activities of

daily living and maintain social functioning.  (*Id.*).  According to Hochberg, there was

insufficient evidence to determine whether Bermudez had suffered from repeated episodes of

deterioration.  (*Id.*).  Hochberg completed a mental RFC assessment.  (Tr. 160-63).  Hochberg

opined that Bermudez suffered from moderate limitations in her ability to work in coordination

with or proximity to others without being distracted by them, complete a normal workday and

workweek without interruptions from psychologically-based symptoms, perform at a consistent

pace without an unreasonable number and length of rest periods, accept instructions and respond

appropriately to criticism from supervisors, and get along with coworkers or peers without

distracting them or exhibiting behavioral extremes.  (*Id.*).  According to Hochberg, Bermudez

was capable of performing entry-level work in a low interactive setting.  (*Id.*).


III.    **Non-Medical Evidence**

In her application for benefits, Bermudez reported that she was born in 1988, had

completed the seventh grade and had not previously been employed.  (Tr. 110, 114).  Bermudez

reported that she lived in a house with her family and that she had a boyfriend.  (Tr. 120).

According to Bermudez, she cares for her dog, attends appointments and watches

television.  (Tr. 120-21).  Bermudez indicated that she is able to care for her own personal

hygiene without assistance and can prepare simple meals. (Tr. 121-22). According to

Bermudez, she is able to wash laundry and perform some household chores, although she

sometimes experiences difficulty functioning due to depression and stress. (Tr. 122-23).

Bermudez does not have a driver's license and relies upon her father for transportation. (*Id.*).

Bermudez reported that she is able to grocery shop for approximately one hour,

once a month. (*Id.*). According to Bermudez, she talks on the phone and watches television

daily, but does not frequently leave the house and has a hard time getting along with her relatives

and with others. (Tr. 124, 26). Bermudez reported that stress causes mood swings and that she

has severe anxiety problems. (*Id.*). Bermudez also indicated that she has difficulty sleeping.

(Tr. 121).

During the administrative hearing, Bermudez testified that she had never been

employed. (Tr. 26). According to Bermudez, she had applied for several jobs in 2006, but was

not hired. (*Id.*). Bermudez testified that her father had driven her to the hearing and that she did

not have a driver's license. (Tr. 27). According to Bermudez, she has not attempted to obtain a

driver's license because she is afraid of cars as a result of an earlier accident. (*Id.*).

Bermudez testified that she lives in a house with her father and that she is able to

assist with chores, including mopping, cleaning dishes and washing laundry. (Tr. 27-28).

According to Bermudez, she can prepare simple meals, but is unable to prepare more

complicated meals due to drowsiness caused by her medication. (*Id.*). During a typical day, she

watches television, listens to music, talks on the phone to her friend and experiences crying

spells while isolating herself in her room. (Tr. 28-29). According to Bermudez, she sometimes

goes clothes shopping with her father, but does not like to go shopping alone due to her anxiety

around other people. (Tr. 28, 38-39).

Bermudez testified that she has difficulty focusing and that she experiences anxiety, characterized by chest pains and negative thoughts, around other people.  (Tr. 28-30).  In addition, Bermudez testified that she is easily frustrated and experiences suicidal thoughts, has difficulty sleeping and decreased energy.  (Tr. 30).  According to Bermudez, she treats with a psychiatrist once a month and a therapist twice a month, and has been prescribed sleeping pills and Celexa.  (Tr. 30-31).  Bermudez testified that she had completed the sixth grade, but stopped attending school in the seventh grade due to problems at school and a lack of parental oversight.  (Tr. 32).  According to Bermudez, she would like to obtain her GED, but has difficulty overcoming her mental symptoms because she lives with her father, with whom she has "a lot of problems."  (*Id.*).  In addition, Bermudez testified that she experiences financial stress which makes it difficult for her to do things for herself.  (Tr. 33).  According to Bermudez, her impairments are mental in nature and she does not suffer from any physical impairments.  (*Id.*).

Bermudez testified that she experiences half-hour anxiety attacks approximately three times a day, which are characterized by nervousness, shakiness and crying.  (Tr. 33-34).  During an attack, she generally calls her friend who is able to calm her down.  (*Id.*).  Bermudez also testified that she sees shadows "all the time" that are not really there and also hears her name being called.  (Tr. 34-35).  According to Bermudez, these hallucinations precipitate anxiety attacks, which prevent her from focusing for a significant period afterwards.  (Tr. 35-36).  According to Bermudez, she frequently isolates herself in a room when she has company or visits relatives.  (Tr. 36-37).  Bermudez testified that she sometimes thinks of hurting herself, but never thinks of hurting others.  (*Id.*).  Additionally, Bermudez frequently feels as though people are talking about her.  (Tr. 38).  Bermudez also testified that she had difficulty remembering things.  (Tr. 39).

Bermudez testified that she would likely only be able to work two or three days a week due to her anxiety and that she would likely suffer panic attacks at work. (Tr. 40). Bermudez testified that she is currently experiencing financial issues and difficulty with her relatives and wants to live on her own. (Tr. 41). According to Bermudez, she believes that her mental symptoms are exacerbated by her living situation because of her problems with her father. (*Id.*).

Vocational expert, Ashley H. Johnson ("Johnson"), also testified during the hearing. (Tr. 42-46). The ALJ first asked Johnson to characterize Bermudez's previous employment. (Tr. 42). According to Johnson, Bermudez had no previous employment. (*Id.*).

The ALJ then asked Johnson whether a person would be able to perform any jobs that existed in the national or local economy who was the same age as Bermudez, with the same education and vocational profile, who was able to understand, remember and carry out only simple instructions, make judgments on simple, work-related decisions, interact appropriately with supervisors and coworkers in routine work settings, and respond to usual work situations and changes in a routine work setting, but could only tolerate superficial and no direct customer service interaction with the public and only occasional interaction with coworkers, and who could perform the full range of work at all exertional levels. (Tr. 42-43). Johnson testified that such an individual would be able to perform positions in the national economy, including laundry worker, industrial cleaner and automobile detailer. (Tr. 43). The ALJ then asked Johnson whether jobs would exist for the same individual with the same limitations, except that the individual would have two intermittent and unpredictable episodes in which they would be off-task for half an hour each day. (Tr. 44). Johnson opined that such an individual would not be able to maintain employment on a full-time, competitive basis. (*Id.*). Johnson also testified

based on her experience that the generally acceptable tolerance for absence for unskilled work

was no more than one or two days per month.  (Tr. 44-45).


# DISCUSSION

## I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)    if not, whether the claimant retains the residual functional
capacity to perform any other work that exists in significant
numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.    The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 52-60).  Under step one of the process, the ALJ found that Bermudez has

not engaged in substantial gainful activity since August 24, 2010, the application date.  (Tr. 54).

At step two, the ALJ concluded that Bermudez has the severe impairments of depression and

anxiety.  (*Id.*).  The ALJ concluded that Bermudez's back pain and obesity were not severe.

(*Id.*).  At step three, the ALJ determined that Bermudez does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.

(Tr. 54-55).  With respect to Bermudez's mental impairments, the ALJ found that Bermudez

suffers from moderate difficulties in maintaining concentration, persistence or pace, social

functioning and in performing activities of daily living.  (*Id.*).  The ALJ concluded that

Bermudez has the RFC to perform the full range of work at all exertional levels and could

understand, remember and carry out simple instructions, make judgments on simple work-related

decisions, interact appropriately with supervisors and coworkers in routine work settings, and

respond to usual work situations and changes in a routine work setting, but could only tolerate

superficial or no direct customer service interaction with the public and occasional interaction

23

with coworkers. (Tr. 55-56). At step four and five, the ALJ determined that Bermudez had no

prior work, but that other jobs existed in the national and regional economy that Bermudez could

perform, including the positions of laundry worker, industrial cleaner and automobile detailer.

(Tr. 58-60). Accordingly, the ALJ found that Bermudez is not disabled. (*Id.*).

> **B.** **Bermudez's Contentions**

Bermudez contends that the ALJ's determination that she is not disabled is not

supported by substantial evidence and is the product of legal error. (Docket # 13-1). First,

Bermudez contends that the ALJ erred when evaluating Akmese's opinion and by failing to

recontact Akmese, resulting in a physical RFC assessment unsupported by substantial evidence.

(*Id.* at 17-21). Next, Bermudez contends that the ALJ improperly elevated his lay opinion over

the medical opinions of record and improperly discounted Masceri's opinion, resulting in a

mental RFC assessment unsupported by substantial evidence. (*Id.* at 21-25). Finally, Bermudez

contends that the ALJ failed to properly assess her credibility. (Tr. 25-30).


> **II.** **Analysis**

> **A.** **Physical RFC Assessment**

Bermudez challenges the ALJ's determination that she did not suffer from any

exertional limitations, contending that the ALJ failed to provide good reasons for rejecting the

limitations assessed by Akmese, Bermudez's treating physician. (Docket # 13-1 at 17-18).

Generally, a treating physician's opinion is entitled to "controlling weight" when

it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.

§ 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361

F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician, because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture of the claimant's medical history."  *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly consider:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)).  "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded."  *Salisbury v. Astrue*, 2008 WL 5110992 at *4.  The same factors should be used to determine the weight to give to a consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).  "However, if the treating physician's

relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

   I conclude that the ALJ provided "good reasons" for his decision to give limited weight to Akmese's opinion concerning Bermudez's exertional limitations. (Tr. 58). In his decision, the ALJ discounted Akmese's opinion that Bermudez had exertional limitations due to her back pain on the grounds that it was inconsistent with other substantial evidence in the record. Akmese relied upon Bermudez's complaints of back pain when assessing pushing, pulling, twisting, lifting and carrying limitations, and the ALJ concluded that the record did not support those limitations. In discounting Akmese's opinion, the ALJ noted that Bermudez had testified that she did not suffer from any physical impairments. Additionally, when determining that Bermudez's back pain did not constitute a severe impairment, the ALJ noted that the record did not contain any evidence of a medically determinable impairment that would cause back pain. (Tr. 54).

   This determination is supported by a review of Akmese's treatment notes showing that Bermudez was evaluated for her complaints of back pain only twice. (Tr. 223, 226-30). Although Akmese prescribed a muscle relaxant to address Bermudez's complaints, his physical examinations of Bermudez revealed essentially normal findings. Specifically, the examinations revealed no tenderness and normal range of motion and intact strength, sensation and reflexes in Bermudez's legs. (*Id.*). Additionally, the straight leg test was negative, and Bermudez was able to squat and perform heel and toe walking. (*Id.*). Nothing in the record suggests that Bermudez continued to seek treatment for back pain.

Accordingly, I conclude that the ALJ did not violate the treating physician rule by according "limited weight" to the opinions of Akmese for the reasons he explained. *See Scitney v. Colvin*, 41 F. Supp. 3d 289, 302-03 (W.D.N.Y. 2014) (ALJ properly discounted opinion of treating physician where the opinion was inconsistent with the record as a whole, including the opinions of state consultative physicians and claimant's testimony of daily activities); *Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (ALJ did not err in declining to credit opinion of treating physician where the "opinion was contradicted by 'other substantial evidence in the record,' including two other doctors' opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5 (W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a whole where opinion conflicted with opinions of state agency medical consultants and was inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

Bermudez contends that the ALJ discounted Akmese's opinion on the grounds that Akmese did not assess any limitations relating to Bermudez's depression. (Docket # 13-1 at 19). Bermudez's contention misconstrues the ALJ's determination. In discussing Akmese's opinion, the ALJ noted that Akmese had opined that Bermudez's limitations were caused by her depression and back pain, but noted that the limitations assessed by Akmese related solely to Bermudez's back pain. (Tr. 58). Nothing in the ALJ's decision suggests that he discounted Akmese's opinion because she failed to assess limitations arising from Bermudez's depression; rather, the ALJ's decision explicitly states that Akmese's opinion was discounted because it was not supported by record evidence. (*Id.*). Accordingly, I conclude that the ALJ did not err by failing to recontact Akmese. *See Ayers v. Astrue*, 2009 WL 4571840, *2 (W.D.N.Y. 2009) ("where, as here, the particular treating physician's opinion that is at issue is unsupported by any medical evidence and where the medical record is otherwise complete, there is no duty to

recontact the treating physician for clarification[;] . . . [t]he fact that the record does not support the treating physician's opinion does not mean that there are administrative gaps in the record triggering a duty to recontact").

**B.      Credibility Assessment**

Bermudez contends that the ALJ's mental RFC assessment is flawed because the ALJ improperly concluded that her mental impairments were caused by her relationship with her father and were not a response to Bermudez's interactions with the general public.[8] (Docket ## 13-1 at 21-25; 20 at 4-5). According to Bermudez, this conclusion was in reality an improper lay opinion, which resulted in the ALJ's improper discounting of her mental illnesses. (*Id.*). Additionally, Bermudez contends that the ALJ erred when he concluded that Masceri's opinions were inconsistent with one another and entitled to limited weight. (*Id.*).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. § 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.F.R. § 404.1529(c)). The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and

---

[8] Although Bermudez asserts this argument as a challenge to the ALJ's mental RFC assessment, I conclude that the salient question is whether the alleged error affected the ALJ's credibility assessment.

> (7) other factors concerning the claimant's functional limitations
> and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

In his decision, the ALJ recounted information from Bermudez's treatment records that he described as demonstrating that the "major source of her troubles is her chaotic living environment and difficulties with her father." (Tr. 57). According to the ALJ, the treatment records reveal that Bermudez frequently fought with her father. (*Id.*). Additionally, the ALJ noted that Masceri stated that "the constant rejection from her father causes the claimant's emotional disregulation." (*Id.*). The ALJ further noted that Masceri attributed Bermudez's slow and poor progress to the fact that she remained in the "high conflict" living arrangement. (*Id.*). Based upon this information, the ALJ stated that the record "indicates that the claimant's symptoms are from this particular stressor, and are not a response to the public, strangers, or any other people in particular." (*Id.*).

Having carefully reviewed the record and the ALJ's decision, I conclude that the meaning of the ALJ's statement about Bermudez's symptoms is ambiguous. On the one hand, the statement could be read as a conclusion that the principal *cause* of Bermudez's symptoms was her dysfunctional, conflict-laden relationship with her father, a conclusion which the record would appear to support. On the other hand, the ALJ's statement could be read as a conclusion that Bermudez's symptoms were *triggered solely* by her interactions with her father and that she is not symptomatic around others, or that she would not be symptomatic around others if she no longer lived with her father. This alternative meaning of the ALJ's ambiguous conclusion is not supported by the record, which includes many treatment notes referring to Bermudez's anxiety around other people and Bermudez's own testimony regarding her anxiety around other people, including her relatives.

If the latter meaning is a correct interpretation of the ALJ's conclusion, it reveals that the ALJ minimized Bermudez's mental impairments.  It is also possible that such an unfounded conclusion regarding the trigger of Bermudez's symptoms contaminated the ALJ's credibility analysis.  *See Andrews v. Colvin*, 2013 WL 5878114, *12 (W.D.N.Y. 2013) ("[t]he ALJ's recitation of the facts contained in the credibility assessment must be accurate and contain an explanation why they undermine the credibility of the witness") (citing *Horan v. Astrue*, 350 F. App'x 483, 485 (2d Cir. 2009) ("[b]ecause the ALJ's credibility determination was based largely on these factual errors, we cannot say that it is supported by substantial evidence")). Considering the Court's inability to discern the meaning of the ALJ's ambiguous but clearly significant statement, and the reasonable possibility that the ALJ's credibility assessment may have been infected by a factual conclusion refuted by the record, remand for clarification is appropriate.  *Hogan v. Astrue*, 491 F. Supp. 2d 347, 353 (W.D.N.Y. 2007) (remanding for clarification of the basis for the ALJ's credibility determination; "the ALJ made a number of ambiguous statements that prevent the [c]ourt from determining whether findings about the plaintiff's credibility ought to be upheld under the deferential standard of review").

Because I conclude that remand is appropriate for clarification of the ALJ's credibility assessment, I am unable to meaningfully review the ALJ's mental RFC analysis,[9] and I do not reach Bermudez's remaining contentions regarding the ALJ's mental RFC assessment or her remaining challenges to the ALJ's credibility determination.  *See Meadors v. Astrue*, 370 F. App'x 179, 185-86 (W.D.N.Y. 2010) ("[b]ecause we conclude that the ALJ erred in assessing [claimant's] credibility, thereby depriving us of the ability to subject his RFC determination to meaningful review, we do not reach [claimant's remaining contentions]").

---

[9]  The ALJ credited Bermudez's testimony that she did not suffer from any physical impairments.  Thus, the ALJ's partially adverse credibility determination did not affect his physical RFC assessment.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 12**) is **DENIED**, and Bermudez's motion for judgment on the pleadings (**Docket # 13**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
      March 18, 2015